UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| EDWARD P. BROWN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-457 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| JOHN CASON, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving two terms of 15 to 22½ years, imposed by the Grand Traverse County Circuit Court on July 9, 1999, after a jury convicted Petitioner of two counts of third-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d(1)(b). In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.   WAS DEFENDANT BROWN DENIED HIS RIGHT TO A UNANIMOUS VERDICT WHERE ONE JUROR EXPRESSED DISAGREEMENT WITH THE VERDICT BUT EVENTUALLY ASSENTED THERETO UPON FURTHER EXAMINATION AND SCRUTINIZED ATTENTION BY THE TRIAL COURT?

II.   WAS DEFENSE COUNSEL INEFFECTIVE FOR FAILING TO FILE A MOTION TO QUASH DEFENDANT'S INCULPATORY STATEMENTS AND FAILING TO OBJECT TO TESTIMONY REGARDING THOSE STATEMENTS AT TRIAL?

III.   WAS THE 15 TO 22 ½ YEAR TERM OF IMPRISONMENT IMPOSED IN THE CASE AT BAR FOR CRIMINAL SEXUAL CONDUCT, 3RD DEGREE, ENHANCED PURSUANT TO THE HABITUAL OFFENDER STATUTES, DISPROPORTIONATE TO THE OFFENSES AND THIS OFFENDER AND AN ABUSE OF SENTENCING DISCRETION?

Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied because they are either noncognizable state law claims, procedurally defaulted, or without merit. Upon review and applying the AEDPA standards, I find that grounds one and two are without merit and ground three is noncognizable. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from incidents occurring on the afternoon of September 19, 1998, during which Petitioner raped Heidi Rader twice. Petitioner was charged with two counts of first-degree criminal sexual conduct, and, in the alternative, third-degree criminal sexual conduct. He also was charged as an habitual offender, second offense. Following a preliminary examination on November 12, 1998, he was bound over on all charges. Petitioner was tried before a jury beginning May 25, 1999, and concluding on May 27, 1999.

The victim, Heidi Rader, was the first witness for the prosecution. (Tr. I, 144.[1]) Rader testified that she was 37 years old. In 1978, she had been in an accident in which she suffered a head injury. (Tr. I, 144.) She testified that, while most of her mental abilities had since returned, she still responded somewhat slowly to complex questions. Her memory had improved significantly since her injury. (Tr. I, 145.)

Rader testified that on September 19, 1998 at approximately 11:45 a.m., her boyfriend, Robin Robertson, asked her to join him at Little Bo's Saloon in Traverse City, to meet with an old friend of his. (Tr. I, 146, 147, 149.) She resisted because she did not want her boyfriend

---

[1]Transcripts of the three days of trial proceedings are referenced as follows: May 25, 1999, "Tr. I, ___"; May 26, 1999, "Tr. II, ___"; May 27, 1999, "Tr. III, ___."

to go and she did not want him to drink.  (Tr. I, 146.)  She eventually decided to go, and she met Petitioner Ed Brown and Freada Williams, a girl described as Petitioner's traveling companion. (Tr. I, 147.)  Petitioner and Robertson were drinking beer.  Williams was not drinking, and Rader had coffee, the first cup with a shot of Kahlua.  (Tr. I, 147-49.)  After some time, Rader and Robertson returned to Rader's house.  Petitioner and Williams told them they were going to Oleson's, and they would call within the hour.  (Tr. I, 149.)  Approximately an hour later, Petitioner called.  (Tr. I, 149.)  Because Robertson was too drunk to drive, he told Rader to pick up Petitioner and Williams and give them a ride somewhere in the Hoosier Valley area.  She picked them up at Oleson's on West Front Street.  She was driving a 1990 Buick Century.  (Tr. I, 150.)  Rader testified that, when she first picked up Petitioner and Williams, Petitioner asked to put some things in the trunk of the car.  (Tr. I, 172.)  Petitioner sat in the front passenger seat and Williams sat in the back seat.  Rader drove them through Chum's Corners, and, following directions from Petitioner to the Hoosier Valley area.  (Tr. I, 151.)  As they drove, Petitioner drank beer.  (Tr. I, 173.)  Petitioner directed Rader onto a narrow road, claiming that the person he needed to see was located deep in the woods.  The road became more overgrown, and eventually Rader's car became stuck in a mud hole. (Tr. I, 152.)

Petitioner and Williams got out, telling Rader to stay in the car.  The two briefly tried to push the car out from the front.  Williams then went toward the back of the car and Petitioner motioned Rader to get out.  As she went out to the front of the car, Petitioner grabbed her neck and held up a knife saying, "[S]hut up, all I want is your car. . . . You say a word, I'll cut you.  I'll tie you to the tree.  I'm going to rape you. . . . If you're quiet, I'll get rid of Freada, and you can go with me. I just want your car.  So it's either get tied to the tree, I don't know if I'm going to cut you yet, or –

and I'll take Freada, or I'll leave Freada and take you." (Tr. I, 153-54.) Petitioner slapped her in the face after he told her not to scream. Rader did not scream, but froze in fear. (Tr. I, 155.) Petitioner then directed Rader to walk a number of yards away from the front of the car, toward the woods, where she was directed to get down on the ground. (Tr. I, 156.) From where she was, Rader could see the car only a little, but could not see Freada. (Tr. I, 157-58.) Petitioner then raped Rader, after which he drank two beers he had with him. (Tr. I, 156, 159.) Petitioner told her to be quiet and hit her again. (Tr. I, 158.) During this time, Williams was near the back of the car, looking for limbs to use to get the car out. (Tr. I, 156.)

Rader testified that she did not consent to the sexual conduct, but she did not fight him because she was afraid both because he was very much larger than she was and because he had a knife. (Tr. I, 159.) Petitioner ordered Rader to take off her clothes. (Tr. I, 162.) She took off her sweatshirt and put it on the swampy ground to lie on. (Tr. I, 164.) She also took off her pants and underwear, but she did not remove her shirt. (Tr. I, 163.) Petitioner then had vaginal intercourse with her. (Tr. I, 162.) During the first rape, Rader asked Petitioner to stop because she had spinal curvature caused by her bad hip and was in a lot of pain from a large branch under her spine. (Tr. I, 162.) Rader testified that she did not yell out to Williams because she believed Williams was Petitioner's girlfriend and seemed like an abused girlfriend. She also did not want to be killed. (Tr. I, 162.) After about 20 minutes, Petitioner told her to get dressed and they returned to the car. (Tr. I, 163, 166.) Rader said nothing to Williams about the rape because she believed Williams had been subjected to something similar from Petitioner. (Tr. I, 166.)

Approximately half an hour later, Williams left to get help. (Tr. I, 166.) After Williams left, Petitioner ordered Rader into the back seat of the car. She unsuccessfully attempted

to delay him by stressing the need to get the car out.  (Tr. I, 167-68.)  Petitioner grabbed her arm and

threatened her.  (Tr. I, 193-94.)  Once Rader got into the car, Petitioner removed her pants and

underwear and again vaginally raped her.  (Tr. I, 168.)  During both rapes, Rader believed Petitioner

still had the knife either in his hand or in his pocket.  (Tr. I, 170.)  When they first returned to the car

after the first rape, Rader opened her trunk to look for the jack, and she saw clothesline in her trunk

that was not her own.  (Tr. I, 170-71.)

Williams returned about two hours later with a relative and some young children.  (Tr.

I, 174.)  By the time she returned, Petitioner had finally gotten the car out of the mud and was driving

out of the woods, with Rader sitting in the front passenger seat.  (Tr. I, 174-75.)  Rader testified that,

because the man was connected with Williams, she did not tell anyone about the rape.  (Tr. I, 176.)

After they met the other car, Petitioner followed the car to a trailer.  Rader did not get out of the car,

but Petitioner got out and went a few feet away to talk with the other people and Williams.  Rader

still did not feel safe to say anything.  (Tr. 176-77.)  Petitioner returned to the car and Williams got

in the back seat.  They drove a short distance to the Pantry Shelf, because Rader kept saying she

needed to eat, as she was on medicine and could faint.  (Tr. I, 178.)  Petitioner and Williams got out

of the car and ordered Rader to stay.  Rader got out and called her boyfriend and then 911; she no

longer could recall precisely whom she called first.   (Tr. I, 178, 181.)  Petitioner came out and

ordered her off the phone.  She begged to go inside to use the bathroom.  Once inside, she told the

clerk she had been raped and the clerk pointed her back to the manager's office where the manager

dialed 911 for her.  (Tr. I, 179-80.)  She remained in the back room until Trooper Halvorsen arrived.

(Tr. I, 182.)  She eventually was transported to Munson Hospital emergency room, where she was

seen by Nurse Mary Wagner.  (Tr. I, 182.)  Rader testified that after she returned home, she found

the clothesline in her trunk.  She threw it away from herself toward her neighbor's house because she did not want to see it.  She later showed police officers where to find it.  (Tr. I, 191-93.)  She also found an unopened beer can in the rear passenger compartment of her car.  (Tr. I, 191-92.)

On cross-examination, Rader acknowledged that she had neglected to inform the jury that she had left the bar at about 1:00 p.m. to withdraw about $20 from her bank account because her boyfriend wanted to buy some marijuana.  (Tr. I, 206-09, 211.)  She also acknowledged mistakenly giving the name "Carl" to the nurse and officers, instead of "Ed."  (Tr. I, 212.)  In addition, she testified that Petitioner and Williams did not put things in the trunk until Hoosier Valley.  (Tr. I, 223.)  She testified that she asked Petitioner if he would use a condom, which she had in her purse, but he did not.  (Tr. I, 254.)

Freada Williams testified that on September 19, 1998, she had known Petitioner for 20 years and, since February of that year, was his girlfriend.  She and Petitioner were living with her father in the Thompsonville area.  (Tr. II, 4-5.)  At about 11:00 or 11:30 a.m. on that date, she and Petitioner went to Little Bo's Bar and met up with Rader and her boyfriend, Robin.  (Tr. II, 5.)  While at the bar, Williams drank only water.  Petitioner shared two pitchers of beer with Robin.  (Tr. II, 7.)  Rader drank coffee.  (Tr. II, 8.)  When they left the bar, she and Petitioner went to Oleson's, where she initially purchased two bottles of pop and two packs of cigarettes.  (Tr. II, 8.)   Upon Petitioner's instruction, she took money he gave her and went back in and purchased a clothesline, which she understood was to be used to tie up their bedroll when they continued a trip they had been making until ten days before.  (Tr. II, 8-9, 43, 54.)  She also purchased a six-pack of beer at Petitioner's request.  (Tr. II, 43-44.)  Petitioner called Rader and she came to pick them up.  (Tr. II, 10.)  Petitioner got in the front passenger seat and Williams got into the back seat.  Petitioner then

gave directions to Rader out to Hoosier Valley.  (Tr. II, 10-11.)  Petitioner said he knew a hermit in Hoosier Valley and he had arranged a marijuana purchase.  (Tr. 10-11.)  Petitioner directed Rader onto a two-track, which became very muddy, and the car got stuck.  (Tr. II, 12.)  After they got out of the car, Petitioner told Williams that he intended to use the clothesline to tie up Rader so that he could steal the car.  (Tr. II, 12-13.)  Williams saw Petitioner touch Rader's shoulder and slap her once or twice.  (Tr. II, 13.)  Rader appeared surprised by the slap and leery of Petitioner.  (Tr. II, 51.)  Williams did not remember seeing a knife.  (Tr. II, 13.)  She heard Petitioner ask Rader for the car keys and heard him tell her to come with him into the woods.  (Tr. II, 14.)  Petitioner touched Rader's shoulder and guided her into the woods.  (Tr. II, 51.)  They were gone approximately 20 minutes, and when they came back, Petitioner had debris such as leaves and tree bark on his shirt. (Tr. II, 14, 74.)  She assumed they had had sex.  (Tr. II, 19.)  The three tried again to get the car unstuck.  (Tr. II, 14.)  Williams volunteered to go look for help.  She walked approximately two-and-one-half hours to her brother's house.  Her brother was not home, but her cousin, Ray Hankin, was there.  Her cousin drove her back to Hoosier Valley in his station wagon.  (Tr. II, 15-16.)  Her cousin had known Petitioner for ten to fifteen years.

Just as they reached the point where the two-track met Blair Town Hall Road, she and her cousin met Petitioner and Rader coming out.  (Tr. II, 17-18.)  She got in the back seat of Rader's car and they followed her cousin to the end of their drive.  They went on to the Pantry Shelf.  (Tr. II, 18.)  At the Pantry Shelf, Williams went in to the store and purchased a bottle of orange juice.  (Tr. II, 18.)  She saw Petitioner hand Rader some change, and Rader went to the pay phone.  (Tr. II, 19.)  When the police arrived, Petitioner told Williams to do what he told her or he would slap her and beat the tar out of her.  (Tr. II, 19.)  Petitioner had earlier, while they were at Oleson's, told her to

- 7 -

lie to the police if they asked questions.  (Tr. II, 31.)  She told police that she and Petitioner had been together all day, despite the fact that she was gone for a substantial period of time.  (Tr. II, 20.)  The Wednesday after Petitioner was arrested, when she went to visit him at the jail, he again told her to lie.  (Tr. II, 31.)  She told police she was with Petitioner all day on approximately three total occasions because she was afraid of Petitioner.  (Tr. II, 20-21.)  She testified that the reason she was no longer afraid of Petitioner was that he was now where he could not get to her physically.  (Tr. II, 88.)

Williams identified a red-handled pocket knife belonging to Petitioner, which she had seen him use to clean his nails on the morning of the incident.  (Tr. II, 21.)  She testified that she handed the wrapped clothesline to Petitioner before he took Rader into the woods.  He had it in his hand as he went to the woods.  (Tr. II, 22.)  When he returned, he still had the clothesline.  He told Williams that Rader had "talked him out of it" and that he was still going to steal her car, but she was going to drive.  (Tr. II, 23.)  Williams testified that, when she bought the clothesline, she was unaware of Petitioner's purpose.  When she learned of his intent to steal the car, she did not say anything because she was afraid of Petitioner.  (Tr. II, 24-25.)  Williams acknowledged that, at the preliminary examination, she testified that Petitioner told her he was going to tie up Rader and steal her car while at Oleson's.  At trial, she admitted that she could not remember with certainty when she first knew.  (Tr. II, 35.)  Williams was surprised when Rader returned with Petitioner from the woods, because she believed that he intended to tie Rader up and leave her.  (Tr. II, 25.)

According to Williams, Petitioner had two or three cans of beer with him, and he crushed and tossed away the empty cans when he was finished with them.  He did not leave them in the car, but put them in a plastic bag and tossed them out when they got to the woods.  (Tr. II, 26,

27, 89.)  She also testified that, while in the car on the way back, she saw Rader's hand on Petitioner's thigh.  (Tr. II, 29.)  When Petitioner returned to the car, he was "[k]ind of smiley," and she did not notice any nervousness in Rader.  (Tr. II, 47.)  She testified that Rader, too, had a satisfied smile.  (Tr. II, 52.)

On cross-examination, Williams testified that, while they were at Little Bo's, after Rader returned from the bank and after the others had discussed getting marijuana, Rader gave Williams about $45.  (Tr. II, 61.)  She also testified that the clothesline was never in the trunk, but instead was in her jacket pocket.  Rader therefore could not have seen the clothesline in the trunk.  (Tr. II, 63.)  She did not see Petitioner carry beer into the woods when he took Rader, but when she led the police to the spot later, they found two or three beer cans.  (Tr. II, 67.)

On re-direct, Williams acknowledged that she wrote a letter to Petitioner in jail, telling him she would stick to their story and asking him if she should say that Rader threatened him and he backed her down.  (Tr. II, 85.)  She also acknowledged that, although she no longer was Petitioner's girlfriend after December 1998, she continued to love him "[m]aybe a little, you know, just as a very dear, dear friend."  (Tr. II, 88.)

Geraldine Cebula testified that on September 19, 1998, she was working as a cashier at the Pantry Shelf.  (Tr. II, 93.)  A small, thin woman with very short hair came into the store looking very scared and nervous.  The woman came behind the counter where Cebula was working, grabbed a hold of her arm, and asked for assistance.  (Tr. II, 93-95.)  Cebula took her to her boss' office and shut the door.  Cebula was asked to call 911, which she did, telling the dispatcher that she needed an officer and relaying what the woman told her had happened.  (Tr. II, 95, 97.)  During the course of relating her story, the woman became upset and began to cry, huddling in the corner of the

office so that no one could see her.  (Tr. II, 99.)  Cebula remained in the office with the woman, ignoring her duties at the register.  (Tr. II, 96, 97.)  The only other employee in the store was the stock person, whom she sent to the front cash register.  (Tr. II, 96-97.)  Accordingly to Cebula, the woman told her the man was still out in the parking lot, and she asked Cebula to get her purse and keys from the car so the man could not leave.  Cebula did so.  (Tr. II, 98, 100.)  Cebula identified Petitioner as the man being referred to.  (Tr. II, 98.)  She described the woman as being very shaky, nervous and scared.  (Tr. II, 99.)  The police arrived ten or fifteen minutes later.  (Tr. II, 100.)

Michigan State Police Officer Bonnie Craig testified that she participated in the investigation of the incident.  Together with Detective Sergeant Ken Lady and Trooper John Turnquist, she accompanied Freada Williams out to Hoosier Valley on September 23, 1998.  (Tr. II, 104-05, 106.)  Williams showed the officers where the car had been stuck and where Petitioner and Rader went into the woods.  (Tr. II, 105.)  The officers found a deep rut where the car had been mired, as well as a large branch used to prop up the wheel, a cigarette butt, facial tissue, cellophane wrapper, and some beer cans.  (Tr. II, 107.)  They also found a padded-down area in the woods in the vicinity Williams had indicated.  (Tr. II, 106, 108.)  The beer cans looked newly deposited and fit the coloring description provided by Rader.  (Tr. II, 113.)  Craig and Lady interviewed Freada Williams  on September 23 and 24, and spoke with her again on a later date.  (Tr. II, 114-16.)  According to Craig, Williams was initially calm but becoming angry and upset when they began to discuss the sexual assault, and she eventually began to cry.  (Tr. II, 117.)

On cross-examination, Craig stated that Rader had told her that Rader had understood that Petitioner intended to purchase marijuana.  Rader also mentioned that Robin had wanted some "blow," which she understood to describe cocaine.  (Tr. II, 119-20.)  Craig testified that Rader had

never mentioned that Petitioner was punching or swatting her arms.  (Tr. II, 122.)  Rader described the knife as an orange-handled paring-type knife.  (Tr. II, 123.)  Rader also mentioned something about Petitioner having foreskin, which would have suggested that he was not circumcised.  (Tr. II, 124.)

State Trooper Tim Halvorsen testified that he was the first officer to arrive at the Pantry Shelf on September 19, 1998 at 7:45 p.m.  He met Rader in the manager's office, where he found her scared, shaken and trying to hide behind the door.  (Tr. II, 130.)  Based on what Rader told him, which was that she had been sexually assaulted, he had a brief interview with Petitioner outside the store, where he was standing in a group of several people, including Freada Williams.  (Tr. II, 131, 135.) Petitioner denied having any sexual contact with Rader.  (Tr. II, 131-32.)  After speaking with Petitioner for five minutes, he went back inside to take care of Rader.  (Tr. II, 134.)  He escorted Rader to Munson Medical Center for medical attention and sexual assault assessment.  (Tr. II, 135.)  Halvorsen turned Rader over to Munson medical staff and left the hospital, returning to the post. He spoke with Petitioner again about an hour or an hour-and-a-half after first arriving at the Pantry Shelf.  (Tr. II, 136.)  He again asked Petitioner whether he had had sex with Rader, and Petitioner again denied it.  (Tr. II, 137.)  He re-interviewed Petitioner on a later date and Petitioner repeated that he had not had sex with Rader.  (Tr. II, 137-38.)  On cross-examination, Halvorsen reported that he did not notice Petitioner smelling of alcohol or appearing intoxicated.  (Tr. II, 147.)  Halvorsen acknowledged that he had confiscated Petitioner's red-handled knife while interviewing him in the parking lot.  (Tr. II, 145.)  He testified that he did not believe that he had shown the knife to Rader. (Tr. II, 145, 148, 152.)  He acknowledged that Rader first mentioned the knife on the way to the hospital.  (Tr. II, 153.)

- 11 -

Mary Margaret Wagner testified that she is a registered nurse at Munson Medical Center, who serves as a sexual assault nurse examiner.  (Tr. II, 157.)  She examined Rader on September 19, 1998, spending three or four hours with her.  (Tr. II, 158.)  According to Wagner, Rader was upset, tearful and distraught.  (Tr. II, 158, 180.)  Wagner collected evidence, including Rader's clothes, which were bagged, marked, labeled and sealed.  (Tr. II, 158-59.)  She also took pictures of Rader's abrasions and bruises.  (Tr. II, 159.)  Wagner identified pictures showing multiple scratches and superficial abrasions, as well as two reddened areas on her back, places Rader complained of having pain from the assault.  (Tr. II, 160.)  She also identified pictures of Rader's neck, showing oral suction marks consistent with what Rader told her about the assault.  (Tr. II, 161.)  Rader took no pictures of Rader's arm, though she noted in her report that there were superficial abrasions on her arm.  She also noted that the rape was reported to involve threats of harm, grabbing, grasping or holding, the use of a knife, use of physical restraints, multiple superficial scratches on both the lower and upper extremities.  (Tr. II, 176.)

Julian Habrawski testified that in September 1998, he found a clothesline in the street next door to where he was working as a builder.  (Tr. II, 182.)  Ten minutes after he picked up the clothesline and put it in his truck, the state police arrived.  The sergeant detective asked Habrawski if he had found anything in the street.  Habrawski told him he found the rope and that he had it in the back of his truck.  (Tr. II, 182.)

Detective Sergeant Ken Lady testified that several days after September 19, 1998, he was speaking with Rader, and, on the basis of their conversation, he went to look for the clothesline. He approached Habrawski to ask if he had seen the rope.  (Tr. II, 200.)  Habrawski got the rope out of his truck, and Lady bagged and labeled it.  (Tr. II, 184, 200.)  Lady also recovered an unopened

- 12 -

Milwaukee's Best beer from Rader's car.  (Tr. II, 199.)  Lady testified that Rader had told him that she found the clothesline in her trunk and described it as the one Petitioner had used when he planned to tie her up.  (Tr. II, 185.)

Lady became involved in the investigation on September 22 or 23, 1998, after Halvorsen discussed the investigation, describing the serious nature of the crime.  Accompanied by Trooper Craig, Lady interviewed Rader at the state police post on September 23, 1998.  (Tr. II, 187.) Because it was apparent to him that Williams had conspired with Petitioner to conceal what had occurred, Lady and Craig also interviewed Williams before talking with Petitioner.  (Tr. II, 188.) Williams was again in her home on September 29, 1998.  (Tr. II, 188.)

After the interviews with Rader and Williams, Lady and Craig interviewed Petitioner on September 23 for between a half hour and one hour.  (Tr. II, 185-86.)  Having interviewed Rader, having monitored telephone and written communications between Petitioner and Williams, and having interviewed and received an admission from Williams, Lady knew prior to the interview that Petitioner already had lied to Trooper Halverson on two prior occasions and that he and Williams had conspired to conceal the incidents of September 19, 1998.  (Tr. II, 188-89, 196.)  When confronted, Petitioner admitted that he had had sex with Rader on three occasions, portraying the incidents as consensual oral and penis/vaginal sex.  (Tr. II, 189.) Petitioner told Lady that the events occurred in the woods; he did not mention the car.  (Tr. II, 190.) Petitioner also told Lady that he had lied to Trooper Halverson because he did not like the way the officer had treated him.  (Tr. II, 190.) Petitioner admitted that he and Williams had lured Rader to the Hoosier Valley with the intention of tying her to a tree with the clothesline and stealing her car.  (Tr. II, 191.)  Petitioner stated that Rader had talked him out of tying her up after having sex with him.  He denied having used a knife

- 13 -

against Rader.  (Tr. II, 191.)  Lady testified that he did not press Petitioner, because he intended to set up a more substantial interview with another interviewer and he did not want to make Petitioner hostile or wary.  (Tr. II, 192, 196.)  On cross-examination, Lady testified that Petitioner told him that he had not removed his knife from his pocket until Trooper Halvorsen confiscated it at the Pantry Shelf.  (Tr. II, 203.)

Sergeant Ingrid Dean testified that she was a specialist interviewer and interrogator for the Michigan State Police.  She interviewed and interrogated Petitioner at the Grayling Crime Lab beginning at approximately 1:30 and ending at 4:00 p.m.  (Tr. II, 205, 207-08.)  Dean initially began interviewing Petitioner, but, after inconsistencies began to appear, she began to interrogate him and challenge him.  (Tr. II, 208.)  Although Petitioner at first denied having threatened Rader, he eventually admitted that he did have a red-handled pocket knife that he had held up to her neck. (Tr. II, 210.)  He said he held it in his left hand and put it up to her neck saying, "If you fucking scream, Bitch, I'm going to kill you."  (Tr. II, 211.)  He told Dean that the knife was the same one taken into possession by police.  (Tr. II, 211.)  Petitioner told Dean that, after the incident with the knife, he and Rader were hitting it off and, shortly thereafter, went into the woods to have voluntary sex.  (Tr. II, 211.)  He admitted that he might have asked Rader to remove her clothes, but he did not force her.  (Tr. II, 211.)  He also admitted he slapped Rader twice when he shoved her up against her car.  (Tr. II, 216.)  On cross-examination, Dean acknowledged that she made no contemporaneous notes or any recording of Petitioner's interview.  She made only a twelve-sentence police report, which did not contain a number of the details of the interview.  (Tr. II, 220.)  Following Dean's testimony the prosecution rested.  The defense called no witnesses.

At the conclusion of trial, on May 27, 1999, the jury found Petitioner guilty of two counts of third-degree criminal sexual conduct.  (Tr. III, 124.)  On July 9, 1999, Petitioner was sentenced to serve a term of 15 to 22½ years as an habitual offender.  (Sentencing Transcript, ("S. Tr."), 21, docket #22.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 23, 2000, raised the same three issues raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #23.) Petitioner sought leave to file a *pro per* supplemental brief on appeal raising three issues, one of which overlapped the third issue raised by counsel.  On October 30, 2001, the court of appeals returned the brief because it did not meet the requirements for *pro per* supplemental briefs under the court rules.  By unpublished opinion issued on December 11, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 12/11/01 Mich. Ct. App. Opinion ("MCOA Op."), docket #23.) Petitioner moved for rehearing, which the court of appeals denied on January 18, 2002.  (See 1/18/02 MCOA Ord., docket #23.)

Petitioner filed a delayed pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised a total of seven claims, including the three raised before and rejected by the Michigan Court of Appeals.  By order entered August 20, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket #24.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Unanimous Verdict

In his first ground for relief, Petitioner contends that he was denied his right to a unanimous jury verdict, in violation of his Sixth Amendment right to an impartial jury. Specifically, he contends that the trial judge impermissibly questioned a juror after the verdict had been returned when the juror expressed some uncertainty upon being polled. Petitioner bases his claim on the following portion of the transcript:

THE COURT: Seat thirteen, Ma'am, was that your verdict, that is, count one, criminal sexual conduct, third degree, and count two, criminal sexual conduct, third degree?

JUROR PULLIAM: Yeah, it is. I guess that is the case.

THE COURT: Well, let me ask you, do you have any doubts that we shouldn't – let's ask, are you sure that's your verdict? Is that the verdict you voted for?

JUROR PULLIAM: It has to be unanimous, does it not?

THE COURT: It sure does.

JUROR PULLIAM: And if one feels one way, and say eleven agree then –

THE COURT: We don't have – then there's no verdict at this point.

JUROR PULLIAM: I mean to say you may never change the other eleven, so –

THE COURT: We deal with that –

JUROR PULLIAM: so I could live with the criminal sexual conduct in the third degree.

THE COURT: Okay, well, that's not –

MR. PAPPAS: Judge, I think you just have to ask her does she agree with criminal sexual conduct in the third degree on count one and count two. And if she

- 18 -

says yes, that is her verdict.  I think that is sufficient.  We don't know whether she would have gone for a higher or lower crime or not.

THE COURT: It has to be unanimous.  And there can be further deliberations.  And if agreements can't be reached eventually, then if you don't agree, and it's not unanimous, then no verdict can be entered.

Now, I guess the question is, is this verdict one that you voted for, and is your verdict also, i.e., count one, guilty of criminal sexual conduct, third degree, count two, guilty of criminal sexual conduct, third degree?  Is that your verdict in this case also?

JUROR PULLIAM: Yes, it is.

THE COURT: It is, okay. . . .

(Tr. III, 126-28.)

The Michigan Court of Appeals addressed the question as follows:

Defendant first argues that he was denied his right to a unanimous verdict because the trial court coerced one juror into agreeing with the verdict.  We normally review a claim of jury polling irregularity only for manifest injustice, when the defendant has lodged no objection at trial.  *People v Lewis*, 98 Mich App 142, 145; 296 NW2d 209 (1980).  However, because defendant is alleging a violation of his constitutional rights, we review this unpreserved issue de novo for plain error.  *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999); *People v Echavarria*, 233 Mich App 356, 358; 592 NW2d 737 (1999).  We review claims of coerced verdicts case by case, considering all the facts and circumstances, as well as the particular language used by the trial court.  *People v Malone*, 180 Mich App 347, 352; 447 NW2d 157 (1989).

Here, defendant claims that one juror expressed disagreement with the verdict, and only expressed consent after the trial court's coercive examination, conducted during the polling of the jury panel. Defendant relies on *People v Booker (After Remand)*, 208 Mich App 163; 527 NW2d 42 (1994), to support his argument that questioning the juror in front of the jury panel was inappropriate and that the trial court thereby denied defendant due process and a fair trial.  We disagree that *Booker* is controlling in the instant case.  Our review of the record reveals that the disputed juror did not express disagreement with the verdict.  Rather, the juror expressed agreement with the verdict three separate times.  Further, we find nothing coercive in the trial court's questioning.

Defendant also relies on *Jenkins v United States*, 380 US 445; 85 S Ct 1059; 13 L Ed 2d 957 (1965), and *Malone, supra*, to support his argument that the trial court coerced the juror into agreeing with the verdict. However, neither *Jenkins* nor *Malone* is applicable because the jury in the instant case was able to reach a verdict and because the trial court did not instruct the jury that it must reach a decision. Likewise, defendant's reliance on *People v Engle*, 118 Mich 287, 291; 76 NW 502 (1898), is misplaced because the trial court gave no instruction that could be interpreted as having the effect of persuading the juror to put aside her convictions and be persuaded by the majority. In addition, the trial court did not discourage further deliberations. Defendant has not demonstrated that he was denied his right to a unanimous verdict.

(MCOA op. at 1-2.)

Petitioner fails to identify a clearly established federal constitutional claim. In 1972, the Supreme Court, in a plurality decision, held that an Oregon rule that allowed for criminal verdicts to be decided by a vote of ten to two did not violate the Sixth Amendment. *See Apodaca v. Oregon*, 406 U.S. 404 (1972). In a related case decided the same date, the plurality Court also concluded that the due process and equal protection clauses of the Fourteenth Amendment were not violated by a Louisiana rule permitting conviction by a vote of nine of twelve jurors. *See Johnson v. Louisiana*, 406 U.S. 356 (1972). The Court expressly held that the Constitution did not require unanimity in jury verdicts. Both cases remain good law. Accordingly, Petitioner has no clearly established federal constitutional right to a unanimous verdict.

Further, to the extent Petitioner asserts that the jury verdict was coerced by the trial court's questions during the jury poll, his argument is without merit. Petitioner relies upon *Jenkins v. United States*, 380 U.S. 445 (1965), for the proposition that a court may not coerce a jury's decision by informing the jury that it must reach a decision in the case. In the instant case, unlike in *Jenkins*, the court did no more that attempt to ascertain whether the juror agreed with the verdict as it was returned. The court specifically told the juror that further deliberations could be undertaken

and that, if the jury could not reach a decision, no verdict would be entered and the court would "deal

with that . . . ." The Michigan Court of Appeals correctly applied *Jenkins*, concluding that the trial

judge did not improperly tell the juror that she must reach a decision, nor did he coerce the juror into

putting aside her convictions. The decision of the court of appeals was a patently reasonable

application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).[2]

---

[2]The Court notes that, even had Petitioner identified an established or meritorious federal claim, his claim also is barred by the doctrine of procedural default. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright*, 433 U.S. at 87-88; *Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir. 2003); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals then reviewed Petitioner's claim for plain error, finding none. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485. Nevertheless, where, as here, the procedural default issue raises more questions than the case on the merits, the Court may proceed to the merits, assuming without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

- 21 -

II.   Ineffective Assistance of Counsel

In his second ground for habeas relief, Petitioner asserts that his trial counsel rendered ineffective assistance when he failed to file a motion to suppress Petitioner's inculpatory statements and failed to object to the introduction of testimony regarding those statements at trial.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

- 22 -

Here, Petitioner asserts that counsel was ineffective for failing to move to suppress his initial statement given to police because he was not first provided warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and to suppress the subsequent, warned statements as fruit of the poisonous tree.

When an individual is in custody, law enforcement officials must warn the subject before interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel, in order to protect the individual's Fifth Amendment privilege against self-incrimination. *Id.* at 478-79; *accord Dickerson v. United States*, 530 U.S. 428, 435 (2000). An individual is in custody for *Miranda* purposes when a reasonable person in the defendant's position, knowing that facts as the defendant knew them, would have felt that he was under arrest or was "'otherwise deprived of his freedom of action in any significant way.'" *Cobb v. Perini*, 832 F.2d 342, 346 (6th Cir. 1987) (quoting *Miranda*, 384 U.S. at 477).

The Michigan Court of Appeals analyzed the issue as follows:

Defendant next argues that his trial counsel rendered ineffective assistance. Because defendant failed to move for a new trial or file a motion for a *Ginther*[] hearing, our review of this issue is limited to mistakes apparent on the existing record. *People v Williams*, 223 Mich App 409, 414; 566 NW2d 649 (1997). Defendant argues that his initial statements to a state police trooper were involuntary and should have been quashed because the state trooper did not read defendant his *Miranda*[] right. Further, defendant argues that his subsequent statements to investigating officers should have been quashed as fruit of the poisonous tree. However, defendant fails to identify which statements should have been quashed. Defendant also fails to cite any authority to support his position that counsel was ineffective for failing to quash defendant's statements and for failing to move for a *Walker*[] hearing challenging those statements.

The record does not reflect that the state police trooper read defendant his *Miranda* rights before he questioned defendant. However, *Miranda* warnings are not required unless the accused is subjected to a custodial interrogation. *People v Hill*, 429 Mich 382, 384; 415 NW2d 193 (1987). Under a totality of the circumstances,

- 23 -

we conclude that defendant was not subjected to a custodial interrogation when questioned by the state police trooper. There is nothing in the record to indicate that defendant did not believe he was free to leave. Defendant was not placed under arrest, the length of the questioning was brief, and defendant did not provide inculpatory statements to the state trooper. In fact, each time defendant spoke to the trooper, he denied having sex with the victim. We conclude that trial counsel lacked valid grounds to move to quash any of defendant's statements to the state trooper.

Because defendant has failed to establish that his initial statements to the trooper were improperly obtained, defendant cannot maintain that his subsequent statements to other police officers were fruit of the poisonous tree. Defendant has not established that any statements he made to the police should have been quashed. Thus trial counsel's failure to move to quash defendant's statements and his failure to object to testimony regarding these statements at trial did not constitute ineffective assistance.

(MCOA op. at 2 (footnotes omitted).)

Petitioner makes no effort to demonstrate that he was in custody at the time of his initial statement and that the determination of the Michigan Court of Appeals was unreasonable. According to the record, Trooper Halvorsen had a brief interview with Petitioner outside the store, where Petitioner was standing with several others, including Freada Williams. (Tr. II, 131, 135.) During the five-minute interview, Petitioner denied having any sexual contact with Rader. (Tr. II, 131-32, 134.) Based on the record evidence, no question exists that Petitioner was free to leave and was not in custody at the time of Halvorsen's questioning. Accordingly, the state court's determination that Petitioner was not in custody at the time of the first interview was certainly correct and did not constitute an unreasonable application of clearly established Supreme Court precedent. Because the interrogation was not custodial, counsel cannot be deemed ineffective for failing to move to suppress Petitioner's statement or to object to their introduction at trial. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir.), *cert. denied* 125 S. Ct.

172 (2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978). Further, because the initial statement to Halvorsen was properly obtained, no basis exists for suppressing the subsequent statements as fruit of the poisonous tree, and counsel may not be deemed ineffective for failing to move to suppress those statements. *Id.*

III.   Disproportionate Sentence

In his third ground for habeas relief, Petitioner asserts that the 15 to 22 ½-year sentence he received as an habitual offender is disproportionate and an abuse of sentencing discretion. In his briefs before the Michigan appellate courts, as in his habeas petition, Petitioner did not raise the Eighth Amendment; rather, he claimed that his sentence was disproportionate under the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990). Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of the Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10. It is plain that *Milbourn* was decided under state, not federal, principles. *See Friday v. Pitcher*, No. 02-1564, 2004 (WL 435856, at *4 (6th Cir. Mar. 4. 2004); *Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. April 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). In addressing a claim that a sentence violated *Milbourn* proportionality, the Sixth Circuit stated that the issue was a matter of state law and that there was "no violation of a constitutional right because the United States Constitution contains no strict proportionality guarantee." *Lunsford*, 1995 WL 236677, at *2 (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) and *United States v.Hopper*, 941 F.2d 419, 422 (6th

- 25 -

Cir. 1991)); *Terry v. Trippett*, No. 94-2077, 1995 WL 469424, at *1 (6th Cir. Aug. 7, 1995) (same). Thus, Petitioner's proportionality claim is solely an issue of state law that is not cognizable in a habeas corpus action.

Moreover, even if Petitioner wished to raise a claim that his sentence violated the Eighth Amendment, because Petitioner failed to present the constitutional claim before the Michigan appellate courts, the claim would be unexhausted. Further, the United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin*, 501 U.S. at 965; *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583. A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)). In addition, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Petitioner was not sentenced to death or life in prison without the possibility of parole. Therefore, Petitioner's sentence does not run afoul of the Eighth Amendment's ban on cruel and unusual punishment.

In sum, for multiple reasons, Petitioner has failed to demonstrate entitlement to relief on his third habeas ground.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: April 26, 2005                    /s/ Hugh W. Brenneman, Jr.
                                         Hugh W. Brenneman, Jr.
                                         United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).